# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> v. <br><br> **JOSEPH NATALE and GARY KETCHUM** | Crim. No. 18-650 (KM) <br><br> OPINION |

The Court recently heard oral argument on certain pretrial motions in this criminal case. (*See* DE 88 (minute entry); *see also* Transcript, Apr. 29, 2021.) Most I have decided in the accompanying Omnibus Order, for the reasons expressed on the record. As to two, however, I reserved decision:

(a) the motion of defendant Natale to dismiss counts 4 and 7 of the Indictment (Point I, omnibus motion, DE 46), and

(b) the motion of the United States to voluntarily dismiss Counts 12 and 13 of the Indictment, and to strike paragraphs 13.h and 23.b (DE 65).

I write separately to supplement the reasons given on the record for denial of those two motions.

## A. Background

Defendant Natale is the former CEO and Chairman of First State Bank (FSB). The Indictment alleges that Natale, along with codefendants Albert Gasparro and Gary Ketchum, engaged in various forms of misconduct, much of it surrounding a $7 million loan obtained from a Canadian bank to shore up the finances of FSB. I list the charges most pertinent to the current motions.

Count One charges a dual object conspiracy. The first object is to make false entries in the books of FSB with intent to defraud both the bank and the FDIC, contrary to 18 U.S.C. § 1005.

The second object of the conspiracy is to make and use counterfeit documents to influence an action of the FDIC, contrary to 18 U.S.C. § 1007. The government moves to strike that second object (specifically, paragraphs 13.h and 23.b), so that it is no longer asserted against any defendant, including Natale.

Count 4 charges Natale with making a false entry into FSB's records by having an individual execute a subscription agreement which falsely showed 478,000 FSB shares being purchased by an entity for $2.39 million.

Count 7 charges Natale and Gasparro with executing and backdating a Capital Raise agreement which fraudulently legitimized FSB's payment of a finder's fee to defendant Gasparro for work not performed, namely, "finding" entities which appeared to be investors in FSB.

Count 12 charges Ketchum with bank fraud (18 U.S.C. § 1344) based on his having caused FSB to pay premiums for insurance policies that he knew would not be honored by the issuer, Safecare LTD. Count 13 charges Ketchum with making a false statement to the FDIC (18 U.S.C. § 1007) with respect to the same insurance policies.[1]

**B. Motion of Defendant Natale to Dismiss Counts 4 and 7**

As part of his omnibus motion (DE 46), defendant Natale moved to dismiss counts 4 and 7 of the Indictment for legal insufficiency.[2]

In general, Federal Rule of Criminal Procedure 7(c) requires only that an indictment state the offense's essential elements, sufficiently apprising the

---

[1] Less germane to this opinion are Counts 2–3, 5–6, 8, and 10–11, which charge Natale and/or Gasparro with false statements or fraudulent activity: obtaining a fraudulent finder's fee; bank fraud in connection with inducing FSB to extend sham loans to repay the Canadian loan; false entries in the books of FSB; and false statements to the FDIC. Count 9, which charges Ketchum with making false statements to the FDIC, will presumably be dismissed at the time of his sentencing, pursuant to his agreement to plead guilty.

[2] In the accompanying Order, the motion to dismiss certain counts of the Indictment, insofar as it is directed against Counts 1 and 11, is DENIED for the reasons stated on the record; insofar as it is directed against Count 8, it is DENIED based on the defendant's voluntary withdrawal.

2

defendant of the allegations, and specifically identifying the offense so as to permit the defendant to plead a former acquittal or conviction in the event of a subsequent prosecution. *See, e.g., United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007).

Federal Rule of Criminal Procedure 12(b)(3)(b) authorizes district courts to hear a motion for dismissal of counts of an Indictment for "failure to state an offense." Now, trials, not pretrial motions, are the means of testing the truth of an indictment's allegations. Nevertheless, a count of an indictment may be dismissed for failure to state an offense "if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002). In making that evaluation, the court must take the factual allegations made in the indictment at face value. *United States v. Roque*, 2013 U.S. Dist. LEXIS 80063 at *10 (D.N.J. June 6, 2013).

Counts 4 and 7 charge violations of 18 U.S.C. § 1005. Natale asserts that the Indictment fails to allege facts which satisfy the elements of 18 U.S.C. § 1005 with respect to Counts 4 and 7. (DE 46 at 8–9 (quoting *Panarella*, 277 F.3d at 684).) That statute reads as follows:

> Whoever makes any <u>false entry</u> in any <u>book, report, or statement</u> of [any Federal Reserve bank, member bank, etc.] with intent to injure or defraud such bank, company, branch, agency, or organization, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank . . . or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank . . . .
>
> . . . .
>
> Shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1005 (<u>emphasis</u> added).

Natale asserts that the Indictment fails to allege a "false entry" in a "book, report, or statement" of FSB. (DE 46 at 8–9.) According to Natale, the

3

subscription agreement identified in Count 4 and the capital raise agreement identified in Count 7 are not "book[s]," "report[s]," or "statement[s]" within the meaning of § 1005. Though Natale does not proffer a precise definition of "books," "reports," or "statements," it appears he conceives of them as being something like FSB's "books of account," *United States v. Darby*, 289 U.S. 224, 226 (1933), *i.e.,* the books that would have served as a bank's ledgers in the days before electronic filing systems.

The government responds that § 1005 sweeps broadly and is not limited to formal financial accounting records or journals.[3] It relies on *United States v. Foster*, where the Sixth Circuit considered an inter-office memorandum in which the defendants, purporting to describe the owners of certain partnerships, failed to identify two owners in order to deceive bank officers and the Comptroller of the Currency. 566 F.2d 1045, 1052 (6th Cir. 1977). The Sixth Circuit rejected the defendants' argument that § 1005 applied only to "formal financial accounting records or journals," concluding that the inter-office memo was a "book," "report," or "statement." *Id. Foster* reasoned that "Section 1005 is intended to be broad enough to cover any document or record of the bank that would reveal pertinent information for the officers or directors of the bank." *Id.*

Natale argues that *Foster* is an old case which has not been cited at the Court of Appeals level "for the proposition that Courts should take an expansive view of the meaning of 'books,' 'reports' or 'statements,' for purposes of 18 U.S.C. § 1005." (DE 59 at 12.) That is not quite correct; numerous courts,

---

[3] The government initially asserted in its brief that even if subscription agreement or the capital raise agreement were not "books," "reports," or "statements," their entry into the bank's records *caused* FSB's actual books, reports or statements to contain false entries. (DE 54 at 22–23.) Natale responds that if this were the case, then Counts 4 and 7 would be multiplicitous of Count 6, which alleges that Natale violated § 1005 by causing FSB's "balance sheet and call report and Board minutes to falsely indicate that FSB had received $7 million as additional capital." (DE 59 at 10 (quoting Indictment at 28).) Because I conclude that the subscription agreement and capital raise agreements were "books, reports, or statements," I do not pursue that alternative theory. It could theoretically arise again in connection with jury instructions.

4

with or without citing *Foster* by name, have adopted a similar approach to the definition of "books," "reports," and "statements."

For instance, in *United States v. Chandler*, the Eighth Circuit remarked that:

> Section 1006[4] prohibits the making of "any false entry in any book, report or statement" of, *inter alia*, a savings and loan institution. This language appears to be "broad enough to cover any document or record of [the institution] that would reveal pertinent information for [its] officers or directors."

910 F.2d 521, 523 (8th Cir. 1990) (quoting *Foster*, 566 F.2d at 1052). The *Chandler* court concluded that it would "defy logic to conclude that a bank loan file is not such a record," and thus concluded that a bank loan officer's decision not to put a letter stating a loan was purchased "without recourse" into a loan file was an omission which constituted an "entry" into the bank's books, reports or statements. *Id.*; *see also United States v. Weidner*, 2003 WL 21183177 at *9 (D. Kan. May 16, 2003) ("the statute does not require that the entry be a formal accounting record, or a document internally created or generated by the bank . . . . the balance sheet submitted by Defendant Wittig . . . . became a bank record as part of the loan file. As such, the balance sheet was a statement that provided information to officers or bank examiners about the nature of the loan and the status of the borrower. Such a statement or record is within the parameter of § 1005"); *Cable Partners Ltd. v. National Bank & Tr. Co.*, 1996 WL 255906 at *3 (N.D. Ill. May 14, 1996) ("A false entry under section 1005 is not limited to entries in a bank's financial accounting records, the section was intended to be broad enough to cover any document or record that would reveal pertinent information to officers or directors of the bank").

Other courts have seemingly applied broad interpretations of § 1005, while not explicitly relying on *Foster*. *See, e.g., United States v. Brown*, 898 F.3d

---

[4] 18 U.S.C. § 1006 is Section 1005's sister statute which contains nearly identical language but applies to non-bank financial institutions. *See United States v. Ely*, 142 F.3d 1113, 1119 (9th Cir. 1977).

5

636, 639–41 (5th Cir. 2018) (submitted false loan application is a false entry in book, report or statement); *United States v. Lowe*, 664 Fed. Appx. 38, 43 (2d Cir. 2016) (submitted false verification of deposit form is a false entry in a statement of a bank); *United States v. Hoffman*, 94 F.3d 642, 1996 WL 469901 at *5 (4th Cir. Aug. 20, 1996) (table opinion) (false entry where defendant falsely stated on loan application that he was borrowing money to renovate home rather than to provide funds for another individual). None of those Courts of Appeals required that such "entries" to be debit-and-credit entries into a bank's formal accounting records or journals.[5]

The only decision I have found in Natale's favor (and only by analogy) is *L.A. Limousine, Inc. v. Liberty Mutual Insurance Co.*, 509 F. Supp. 2d 176, 181 (D. Conn. 2007), which evaluated a Connecticut statute with language similar to that of § 1005. Connecticut General Statute § 38a-816(5) prohibits "making any false entry in any book, report or statement of any insurer with intent to deceive." *L.A. Limousine* concluded that "it is evident from the title and text of § 816(5) that it is meant to apply only to financial statements and not the case at hand. An alleged misrepresentation to the state insurance commissioner as to an individual policy endorsement falls outside the intended ambit." *Id.* at 182. Because *L.A. Limousine* concerns Connecticut law, and insurance law at that, I do not find it persuasive, despite the similar language.

Natale points to *United States v. Darby*, *supra*, a 1933 United States Supreme Court case which interpreted § 1005's predecessor statute, R.S. 5209, 12 U.S.C. § 592. That statute read as follows:

> Any officer, director, agent, or employee of any Federal reserve bank, or of any member bank . . . who . . . makes any false entry in

---

[5] Natale points out that certain of the cases cited by the government seemingly assume, without saying so, that certain false entries fell within the statutory prohibition. (DE 59 at 14) The cases cited in text, above, do not share that defect, although it is true that they do not cite *Foster* or discuss the issue in depth. *Hoffman* explicitly found that the defendant in that case "made a false entry in a bank record" by "falsely stat[ing] on [a] loan application that Hoffman was borrowing money for the purpose of renovating his house," 1996 WL 469901 at *5, and *Lowe* concluded explicitly that the "verification-of-deposit form, created by a Commerce Bank employee . . . [was] a statement of that federally insured institution," 664 Fed. Appx. at 43.

6

> any book, report, or statement of such Federal reserve bank or member bank, with intent in any case to injure or defraud such Federal reserve bank . . . shall be deemed guilty of a misdemeanor . . . .

*Darby*, 289 U.S. at 225 n.1 (quoting 12 U.S.C. § 592). The *Darby* Court stated that the aim of § 5209 was "to give assurance that upon inspection of a bank, public officers and others would discover in its books of account a picture of its true condition." *Id.* at 226 (citing *United States v. Corbett*, 215 U.S. 233, 241 (1909)).

*Darby* is surely relevant to the interpretation of § 1005, given the closely parallel statutory language. But the passage quoted from *Darby* is no more than a general statement of statutory purpose, offered in connection with the Supreme Court's *reversal* of the district court's dismissal of charges. To set aside the modern authorities directly interpreting § 1005, with which I agree, I would need to see some fundamental incongruity between those cases and *Darby*'s statement of statutory purpose. I find no such incongruity. *Darby* simply recognizes that the accuracy of a bank's "books of account" depends on the accuracy of the information that goes into them; to knowingly record existing, but counterfeit, assets as if they were real is thus reasonably treated as a false entry. There is no fundamental inconsistency between that principle and the reasoning of the modern case law interpreting § 1005.

Natale further argues that the terms "books," "reports," and "statements" are so broad as to require a narrowing construction in favor of the defendant. (DE 46 at 11.) As to that narrow point, I must disagree. "As a general matter of statutory construction, a term in a statute is not ambiguous merely because it is broad in scope." *Geisinger Community Med. Ctr. v. Sec. U.S. Dep't of HHS*, 794 F.3d 383, 393 (3d Cir. 2015) (quoting *In re Phila. Newspapers*, 599 F.3d 298, 310 (3d Cir. 2010)). These are concededly broad terms, but a statute is not invalid merely because it encompasses a wide range of conduct.

Relatedly, and somewhat more plausibly, Natale asserts that § 1005 is vague and ambiguous: *i.e.,* it "fails to give a person of ordinary intelligence fair

7

notice that [the] contemplated conduct is forbidden by the statute" or "is so indefinite that it encourages arbitrary and erratic arrests and convictions," and thus is "void for vagueness" under the Due Process Clause. (DE 46 at 13 (quoting *Colautti v. Franklin*, 439 U.S. 379, 391 (1979).) I do not agree, however, that § 1005 is unconstitutionally vague. It applies clearly enough to the introduction of false documents to the bank's records in the manner alleged here. Many cases have discussed this statute's application, but no court has ever found § 1005 void for vagueness. In light of the authority discussed above, which is nearly unanimous in favor of the government's position, as well as the absence of any controlling Third Circuit decision to the contrary, I am convinced that § 1005 is sufficiently clear in its prohibition of false statements in documents or records of the bank containing information pertinent to its officers or directors in the discharge of their duties. *See Foster, supra.* That definition easily encompasses the subscription agreement and capital raise agreement at issue in Counts 4 and 7.

The motion to dismiss Counts 4 and 7 is therefore DENIED.

### C. Motion of United States to Dismiss Counts 12 and 13, and to strike paragraphs 13.h and 23.b

The government has moved to dismiss Counts 12 and 13 of the indictment, which are directed solely against a codefendant, Gary Ketchum, who has now pled guilty. It also seeks to strike paragraphs 13.h and 23.b from the conspiracy count, Count 1.[6]

---

[6] The government's motion to dismiss and strike preceded Ketchum's agreement to plead guilty to a Superseding Information that charges him with a single count of conspiracy to make false entries to deceive the FDIC, contrary to 18 U.S.C § 1005. (*See* Plea Agreement (DE 82); Transcript of plea, Feb. 7, 2021 (DE 87).) The Superseding Information is similar to existing Count 1, with paragraphs 13.h and 23.b (*i.e.,* the second object of the conspiracy) removed. Presumably, the government, having agreed to pursue no further charges against Ketchum arising from the events in the Indictment, would move at the time of Ketchum's sentencing to dismiss Counts 9, 12, and 13 in any event. I granted Natale leave to file a surreply brief based on these developments in the case (DE 77), and he did so (DE 88).

8

### 1. Counts 12 and 13

I first consider the motion insofar as it seeks to dismiss Counts 12 and 13, which are not asserted against Natale, but only against defendant Ketchum.

Rule 48, Fed. R. Crim. P., provides that "[t]he government may, with leave of the court, dismiss an indictment, information or complaint . . . ." "Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *United States v Batchelder*, 442 US. 114, 124 (1979); *see also United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case."). Such executive-branch decisions are highly discretionary, and may take into account such factors as "the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan." *Wayte v. United States,* 470 U.S. 598, 607 (1985). A court's refusal to dismiss charges, in particular, "is appropriate only in the rarest of cases," such as when it is "clearly contrary to the public interest," or where "the prosecutor appears motivated by bribery, animus towards the victim, or a desire to attend a social event rather than trial." *In re Richards,* 213 F.3d 773, 786–87 (3d Cir. 2000).

Those theoretical possibilities may have rare real-world applications; the Seventh Circuit, at least as of 2003, was "unaware . . . of any appellate decision that actually upholds a denial of a motion to dismiss a charge on such a basis." *In re United States,* 345 F.3d 450, 453 (7th Cir. 2003). Indeed, reversals of refusals to grant Rule 48 dismissals, or affirmances of such dismissals, appear to be the norm. *See, e.g., United States v. Romero*, 360 F.3d 1248, 1253 (10th Cir. 2004) (district court abused discretion in denying motion to dismiss indictment because "dismissal was not clearly contrary to manifest public interest" and "is a legitimate choice that should be left to the discretion of the government"); *United States v. Smith*, 55 F.3d 157, 159–60 (4th Cir. 1995)

(reversing district court decision denying government request to dismiss indictment; district court improperly "made its own assessment of the public interest" in concluding that there was substantial evidence of defendant's guilt and finding that dismissing indictment would be contrary to public interest; balancing these consideration is the duty of the executive branch); *United States v. Sprofera,* 299 F.3d 725, 727 (8th Cir. 2002) (upholding decision granting motion to voluntarily dismiss charges on morning of trial just before jury selection where "[t]here is no indication that the government acted in bad faith"); *see also United States v. Reyes-Romero,* 959 F.3d 80, 105–06 (3d Cir. 2020) (in context of Hyde Amendment application for fees, holding that "if circumstances arise making it clear that the Government's case is weaker than it once appeared and the Government act[s] promptly to correct [that] error, a court will be hard pressed to find bad faith") (alterations in original; internal quotations omitted)).[7]

For obvious reasons, it is fairly rare for a defendant to object to the dismissal of criminal charges, so case law is somewhat sparse. Judicial discretion, however, must be considered in the context of the broad discretion granted to the prosecution:

> So understood, the "leave of court" authority gives no power to a district court to deny a prosecutor's Rule 48(a) motion to dismiss charges based on a disagreement with the prosecution's exercise of charging authority. For instance, a court cannot deny leave of court because of a view that the defendant should stand trial notwithstanding the prosecution's desire to dismiss the charges, or a view that any remaining charges fail adequately to redress the gravity of the defendant's alleged conduct. *See In re United States*,

---

[7] The cases cited by Natale are not really to the contrary, and are not persuasive. *See United States v. Dyal,* 868 F.2d 424, 429 (11th Cir. 1989) (defendant failed to establish bad faith where government dismissed charges and re-charged the same defendant two years later); *United States v. Carrigan,* 778 F.2d 1454, 1467 (10th Cir. 1985) (court rejected guilty plea based on Rule 11(e), not Rule 48). *United States v. Salinas,* 693 F.2d 348 (5th Cir. 1982), at least involved a finding of bad faith. There, however, the prosecution dismissed charges and refiled them a week later, based on its dissatisfaction with the first jury panel. *Id.* at 352–53.

10

345 F.3d 450, 453 (7th Cir. 2003). The authority to make such determinations remains with the Executive.

*United States v. Fokker Servs. B.V.*, 818 F.3d 733, 742 (D.C. Cir. 2016).

The primary reason that Rule 48 requires leave of the court is to protect the charged defendant from harassment—for example, the repeated assertion and dropping of baseless charges.[8] Here, however, there is no objection from Ketchum, who is the only defendant charged in Counts 12 and 13.

I nevertheless consider *arguendo* the objection of Natale, as codefendant, that the government has not made a showing—variously characterized as the absence of bad faith, harassment, or contravention of the public interest—to support dismissal. For dismissing Counts 12 and 13, the prosecution gives the following reasons. Apparently in response to prodding from the defense, the government obtained from the U.S. Postal Inspection Service in Atlanta certain documents which, *inter alia*, tended to exculpate Ketchum of criminal intent with respect to these particular acts. It produced those documents to counsel for Natale in October and November, 2020. Those counts rest in large part on a CPA letter and counterfeit brokerage statement regarding Safecare's assets. Those documents, says the prosecution, were false, but other documents provided evidence that persons other than Ketchum may have created those or similar counterfeit documents; that the cover email passing on the documents

---

8    The words "leave of court" were inserted in Rule 48(a) without explanation. While they obviously vest some discretion in the court, the circumstances in which that discretion may properly be exercised have not been delineated by this Court. The principal object of the "leave of court" requirement is apparently to protect a defendant against prosecutorial harassment, e. g., charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection. [citing cases] But the Rule has also been held to permit the court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by considerations clearly contrary to the public interest. *See United States v. Cowan*, 524 F.2d 504 (CA5 1975); *United States v. Ammidown*, 162 U.S. App. D.C. 28, 33, 497 F.2d 615, 620 (1973). It is unnecessary to decide whether the court has discretion under these circumstances, since, even assuming it does, the result in this case remains the same.

*Rinaldi v. United States*, 434 U.S. 22, 30, 98 S. Ct. 81, 86 (1977).

11

to Ketchum did not reveal their falsity; that others Safecare employees, possibly fraudsters themselves, were attempting to push Ketchum out of the company; and that Ketchum was not a party to certain communications in which the falsity of the documents was discussed. (*See* Gov't Brf. at 10–11 and documents cited. (DE 65-1); Gov't Reply Brf. at 7–9 (DE 84))

It set aside the issue of whether the presumption of good faith and regularity places the burden on the defendant, rather than the government. The proffered reasons for dismissal are not in the neighborhood of bad faith, harassment or any contravention of the public interest. There is no intimation, for example, of some personal motive, "bribery, animus towards the victim, or desire to attend a social event rather than trial." *Richards*, 213 F.3d at 786. Nor is there tactical chicanery akin to the rapid dismissal and reinstitution of charges to get rid of an unfavorable jury panel. *See Salinas*, 693 F.2d at 352–53. The government, within its discretion, has determined that there is a reasonable doubt as to Ketchum's knowledge and intent, such that Counts 12 and 13 should not be pursued. Since filing its motion, the government has entered into a guilty plea agreement with Ketchum, pursuant to which it will not pursue charges beyond those in the Superseding Information. But declining to go forward with a doubtful charge is a prosecutorial duty, not prosecutorial misconduct.

As I say, the motion to dismiss Counts 12 and 13 is opposed, not by Ketchum, but by his codefendant, Natale. Now of course "a private citizen has no judicially-cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619, 93 S. Ct. 1146, 1149 (1973). Natale argues, however, that it is necessary to maintain the existing charges against Ketchum in order to guarantee that Natale gets a fair trial. Originally, Natale argued that the government was attempting to avoid a severance. Since then, Ketchum has pled guilty, so that argument is moot. Nevertheless, Natale argues that his theory of defense will be that Ketchum was the mastermind behind the fraud, and that Natale, no less than the bank or the FDIC, was Ketchum's victim. By removing two of the charges against

12

Ketchum from the Indictment, says Natale, the government has weakened Natale's argument that Ketchum was the true villain.[9] Indeed, he suggests, the government's benign assessment of the evidence against Ketchum has allowed the true malefactor to escape.

I disagree. The government has proffered a reasonable and plausible basis for its decision. It has cited specific evidence that, as to Counts 12 and 13 only, it may be difficult to prove that Ketchum possessed the necessary knowledge, which may in fact belong to other fraudsters with whom Ketchum worked. Reversing roles, the defense insists that the case against Ketchum is open-and-shut, while the government demurs. The court need not, however, hold an evidentiary hearing to decide which side's judgment is more accurate or probe the government's decision making. It is sufficient that the government has articulated a sufficient basis for its decision, citing specific evidence, and invoked its broad charging discretion. That is not to say, by the way, that Ketchum has been wholly exculpated; far from it. The Superseding Information to which he pled asserts a conspiracy charge essentially identical to the one that Natale faces (assuming that the second object is struck as requested, *see infra*).

Nor is Natale's right to a fair trial impaired. If it is appropriate, based on the evidence, to argue that the true bad actor was Ketchum, that argument remains open to Natale. If Natale wishes to put on a defense that Ketchum is actually the one guilty of the acts attributed to Natale, he may, within the boundaries of the Rules of Evidence, do so. Should Ketchum testify, this

---

[9] The claimed principle seems to be that the government, by indicting Ketchum on Counts 12 and 13, put its credibility behind the proposition that Ketchum was the true villain here, and that his villainy was independent of Natale. (At least in relation to Counts 12 and 13; the primary charge, of course, is that Ketchum conspired *with* Natale.) That quasi-vouching effect, in Natale's view, would have aided Natale in his attempt to shift the blame to Ketchum. By dismissing two of the charges against Ketchum, the argument runs, the government has now withdrawn that aid. As to himself, of course, Natale will surely make the opposite argument; the jury will be charged, that the indictment is only a charge, and that it is not evidence of anything. *See* 3d Cir. Model Jury Instructions (Criminal) § 1.11.

evidence may likewise provide fodder for cross-examination. Indeed, it is very common in criminal cases to argue that, for example, the government has given a cooperating witness an irresponsible, "sweetheart deal." Natale may attempt to cross-examine a testifying Ketchum as to the facts surrounding the charges that were dropped, insofar as they may bear on credibility or a relevant issue.

The government's motion to dismiss Counts 12 and 13 is therefore granted.

### 3. Paragraphs 13.h and 23.b (Conspiracy second object)

I next consider the government's motion to strike the second object of the conspiracy count, as contained in paragraphs 13.h and 23.b.

Paragraph 13.h, part of the overview of facts underlying the conspiracy, reads as follows:

> h. In or about May 2010, defendant KETCHUM submitted a balance sheet to Conroy and FSB showing that in 2008 the Insurer had over $24 million in assets (the "Balance Sheet"), and a letter generated by a CPA firm engaged by defendant KETCHUM showing a brokerage account of over $22 million in Insurer assets in early 2009 (the "CPA Letter"). In fact, defendant KETCHUM knew that the actual account balance in that brokerage account was approximately $44 and that the assets stated on the Balance Sheet also were false.

(Indictment, count I, ¶ 13.h)

Paragraph 23, with the subparagraph sought to be excised highlighted, charges a dual-object conspiracy in violation of 18 U.S.C. § 371, as follows:

> 23. From no later than in or about September 2009 through at least in or about September 2010, in Union County, in the District of New Jersey, and elsewhere, defendants
>
> JOSEPH NATALE,<br>
> ALBERT GASPARRO, and<br>
> GARY KETCHUM
>
> knowingly and intentionally conspired and agreed with each and others to commit offenses against the United States, that is:
>
> a. to knowingly and intentionally make false entries in books, reports, and statements of FSB, and cause false entries in books,

14

reports and statements of FSB to be made, with intent to defraud FSB and to deceive any officer of FSB, and the FDIC, and agents and examiners appointed to examine the affairs of such bank, contrary to Title 18, United States Code, Section 1005; and

**b. to knowingly make, and cause to be made, and invite reliance on a false, forged, and counterfeit statement, document and thing for the purpose of influencing in any way the action of the FDIC, contrary to Title 18, United States Code, Section 1007.**

(Indictment, Count I, § 23 (emphasis added))

For striking these paragraphs, the government gives the following reasons. These paragraphs together relate to a counterfeit CPA letter and Vanderbilt brokerage account statement, allegedly used to deceive the FDIC. The government still believes those documents are plainly counterfeit. The government states, however, that there is a reasonable doubt that Ketchum *knew* the document or documents were counterfeit.

The defendant has a right to go to trial "only on offenses for which a grand jury has returned an indictment"; an indictment may be narrowed, however, where "what was removed from the case was in no way essential to the offense." *United States v. Miller,* 471 U.S. 130, 145 (1985). Thus the government may narrow the theory upon which it goes to trial without returning to the grand jury to reindict. "As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." *Id.* at 136. To proceed to trial on a "subset of the allegations," then, is neither a constructive amendment nor a fatal variance. *United States v Allmendinger,* 706 F.3d 330, 339 (4th Cir. 2013).

Thus, based on *Miller,* the Courts of Appeals, including the Third Circuit, have repeatedly upheld convictions based on indictments that were narrowed before or at trial. *See United States v. Hornick,* 491 F. App'x 277, 287 (3d Cir. 2012) (time span of burglary conspiracy narrowed by jury instructions); *United*

15

*States v. Castro*, 776 F.2d 1118, 1122-23 (3d Cir. 1985) (finding no error when the prosecutor withdrew some charges for which defendant was indicted, and explaining that offenses charged in the indictment "unnecessary to and independent from allegations of the offense proved may normally be treated as 'a useless averment' that may be ignored," particularly when the "variation from the indictment did not broaden the bases for conviction, but instead narrowed the scope of the evidence to prove an offense included in the indictment."); *United States v. Robey*, 831 F.3d 857, 865 (7th Cir. 2016) (rejecting "Robey['s] claim[ of] a constitutional violation because the court dismissed nineteen counts of the indictment prior to trial" because he was "contending 'not that the indictment failed to charge the offense for which he was convicted, but that the indictment charged more than was necessary'"); *United States v. Celestin*, 612 F.3d 14, 25 (1st Cir. 2010) (upholding conviction where "court eliminated a theory of liability rather than removed an element of the crime" by instructing the jury that defendant could not be convicted on a conspiracy theory if the defendant was acquitted on a conspiracy charge); *United States v. Scott*, 243 F.3d 551, 2000 WL 1721808 at *1 (9th Cir. Nov. 17, 2000) (table opinion) ("Because the district court's actions narrowed the scope of the indictment and did not broaden the crimes charged, Scott's substantial rights were not affected.")[10]

This Court might be inclined, in a proper case, to carve out a very narrow exception for striking allegations so intertwined with the others that their omission alters the character of the charges that remain. This, however, is not such a case. The paragraphs to be struck are just two of approximately one hundred in Count One. They are confined to the issue of using the counterfeit documents to mislead the FDIC as to the assets of the insurer, Safecare. They

---

[10] *United States v. Smith*, 1996 WL 706827, at *3 (D. Kan. Oct. 31, 1996), cited by defendant, is not on point. There, codefendants objected to the name a defendant who had pled guilty being moved from the list of defendants to the list of other conspirators. The situation is distinguishable, in that the excision here concerns matters that the government is not going to pursue at trial. But in any event, I find this lone, 25-year-old case from another district unpersuasive.

16

are severable from the remainder of the conspiracy count, in which they are not so much as mentioned. Their absence does not deprive Natale of his right to face only such charges as to which a grand jury found probable cause.

Here, too, Natale has an argument similar to his argument against dismissal of counts: that by dropping these allegations, the government has "sanitized" Ketchum or "inoculated" him from cross-examination, impairing Natale's blame-shifting defense. The first reply, of course, is that the second object of the conspiracy is asserted against Natale, as well as Ketchum; if it is struck, then Natale is likewise relieved of the need to defend against these conspiracy allegations. The second reply is that the government is not required to pursue weaker allegations to the bitter end, just to give a defendant a sporting chance. And the third is that striking these allegations does not deprive Natale of any trial right. He may introduce evidence, or (if Ketchum testifies) cross-examine him using such evidence, if there is a basis to do so within the Federal Rules.

While no threshold showing is required to drop allegations or counts, I would find that the government's basis here is similar to that underlying its decision to dismiss Counts 12 and 13. Based on a review of evidence that has emerged, the government has articulated a reasonable basis for its motion to strike.

## CONCLUSION

For the reasons stated above, and on the record in open Court,

(a) the motion of defendant Natale to dismiss counts 4 and 7 of the Indictment (Point I, omnibus motion, DE 46) is **DENIED**, and

(b) the motion of the United States to voluntarily dismiss Counts 12 and 13 of the Indictment, and to strike paragraphs 13.h and 23.b (DE 65), is **GRANTED**.

These rulings are embodied in paragraphs 2(a) and 3 of the accompanying omnibus order.

/s/ Kevin McNulty
_____
**KEVIN MCNULTY, U.S.D.J.**